Michael R. Lozeau (State Bar No. 142893)
Richard T. Drury (State Bar No. 163559)
Douglas J. Chermak (State Bar No. 233382)
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205 (fax)
E-mail: michael@lozeaudrury.com
           richard@lozeaudrury.com
           doug@lozeaudrury.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>       Plaintiff,<br><br>    vs.<br><br>SOILAND CO., INC., a corporation,<br><br>       Defendant. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), a California non-profit corporation, by and through its counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and

33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On July 31, 2014, Plaintiff provided notice of Defendant's violations of the Act, and of its intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CSPA's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the state and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.  Pursuant to Local Rule 3-2(d), intradistrict venue is proper in Oakland, California, because the source of the violations is located within Sonoma County.

## II.   **INTRODUCTION**

5.      This complaint seeks relief for Defendant's discharges of polluted storm water and non-storm water pollutants from Defendant's industrial facility located at 4343 Stage Gulch Road, in Sonoma, California ("the Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ (hereinafter the "Permit" or "General Permit").  Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6.      The failure on the part of persons and facilities such as Defendant and its industrial facility to comply with storm water requirements is recognized as a significant cause of the

1  continuing decline in water quality of Sonoma Creek, San Pablo Bay and other area receiving

2  waters.  The general consensus among regulatory agencies and water quality specialists is that storm

3  pollution amounts to more than half of the total pollution entering the aquatic environment each

4  year.

5  III.    **PARTIES**

6      1.      Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is

7  a non-profit public benefit corporation organized under the laws of the State of California with its

8  main office in Stockton, California.  CSPA has approximately 2,000 members who live, recreate and

9  work in and around waters of the State of California, including Sonoma Creek and San Pablo Bay.

10  CSPA is dedicated to the preservation, protection, and defense of the environment, the wildlife and

11  the natural resources of all waters of California.  To further these goals, CSPA actively seeks federal

12  and state agency implementation of the Act and other laws and, where necessary, directly initiates

13  enforcement actions on behalf of itself and its members.  CSPA brings this action on behalf of its

14  members.  CSPA's interest in reducing Defendant's discharges of pollutants into Sonoma Creek and

15  requiring Defendant to comply with the requirements of the General Permit are germane to its

16  purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require

17  the participation in this lawsuit of individual members of CSPA.

18      2.      Members of CSPA reside in and around Sonoma Creek and San Pablo Bay and enjoy

19  using those waters for recreation and other activities.  One or more members of CSPA use and enjoy

20  the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be

21  discharged.  One or more members of CSPA use those areas to fish, sail, boat, kayak, swim, bird

22  watch, view wildlife and engage in scientific study including monitoring activities, among other

23  things.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to

24  such threats and impairments.  Thus, the interests of one or more members of CSPA have been, are

25  being, and will continue to be adversely affected by Defendant's failure to comply with the Clean

26  Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff and one or more

27  of its members caused by Defendant's activities.

28      3.      Continuing commission of the acts and omissions alleged above will irreparably harm

COMPLAINT

Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

4.     Defendant Soiland Co., Inc. ("Soiland") is a corporation organized under the laws of California.  Plaintiff is informed and believes and thereupon alleges that Soiland owns and operates the Facility that is the subject of this complaint.

**IV.     STATUTORY BACKGROUND**

5.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

6.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

7.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

8.     The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  On April 1, 2014, the State Board reissued the General Permit.  State Board Order 2014-0057-DWQ.  The reissued version of the General Permit does not go into effect until July 1, 2015.  Until that time, the April 17, 1997 General Permit remains in full force and effect.w

9.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual

1    NPDES permit.  33 U.S.C. § 1311(a).

2        10.     The General Permit contains several prohibitions.  Effluent Limitation B(3) of the

3    General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges

4    through implementation of the Best Available Technology Economically Achievable ("BAT") for

5    toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology

6    ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural

7    measures.  General Permit, Section A(8).  Discharge Prohibition A(2) of the General Permit

8    prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to

9    cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the General Permit

10   prohibits storm water discharges to any surface or ground water that adversely impact human health

11   or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water

12   discharges that cause or contribute to an exceedance of any applicable water quality standards

13   contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

14       11.     The General Permit requires that facility operators "investigate the facility to identify

15   all non-storm water discharges and their sources.  As part of this investigation, all drains (inlets and

16   outlets) shall be evaluated to identify whether they connect to the storm drain system.  All non-storm

17   water discharges shall be described.  This shall include the source, quantity, frequency, and

18   characteristics of the non-storm water discharges and associated drainage area."  Section A(6)(a)(v).

19   The General Permit authorizes certain non-storm water discharges providing that the non-storm

20   water discharges are in compliance with Regional Board requirements; that the non-storm water

21   discharges are in compliance with local agency ordinances and/or requirements; that best

22   management practices are included in the Storm Water Pollution Prevention Plan to (1) prevent or

23   reduce the contact of non-storm water discharges with significant materials or equipment and (2)

24   minimize, to the extent practicable, the flow or volume of non-storm water discharges; that the non-

25   storm water discharges do not contain significant quantities of pollutants; and that the monitoring

26   program includes quarterly visual observations of each non-storm water discharge and its sources to

27   ensure that BMPs are being implemented and are effective (Special Conditions D).  Section B(3) of

28   the General Permit requires dischargers to conduct visual observations of all drainage areas for the

COMPLAINT

1    presence of non-storm water discharges, to observe the non-storm water discharges, and maintain

2    records of such observations.

3         12.    In addition to absolute prohibitions, the General Permit contains a variety of

4    substantive and procedural requirements that dischargers must meet.  Facilities discharging, or

5    having the potential to discharge, storm water associated with industrial activity that have not

6    obtained an individual NPDES permit must apply for coverage under the State's General Permit by

7    filing a Notice of Intent to Comply ("NOI").  The General Permit requires existing dischargers to

8    have filed their NOIs before March 30, 1992.

9         13.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan

10   ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply

11   with the BAT and BCT standards.  The General Permit requires that an initial SWPPP has been

12   developed and implemented before October 1, 1992.  The SWPPP must, among other requirements,

13   identify and evaluate sources of pollutants associated with industrial activities that may affect the

14   quality of storm and non-storm water discharges from the facility and identify and implement site-

15   specific best management practices ("BMPs") to reduce or prevent pollutants associated with

16   industrial activities in storm water and authorized non-storm water discharges (Section A(2)).  The

17   SWPPP's BMPs must implement BAT and BCT (Section B(3)).  The SWPPP must include: a

18   description of individuals and their responsibilities for developing and implementing the SWPPP

19   (Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow

20   pattern and nearby water bodies, the location of the storm water collection, conveyance and

21   discharge system, structural control measures, impervious areas, areas of actual and potential

22   pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials

23   handled and stored at the site (Section A(5)); a description of potential pollutant sources including

24   industrial processes, material handling and storage areas, dust and particulate generating activities,

25   and a description of significant spills and leaks, a list of all non-storm water discharges and their

26   sources, and a description of locations where soil erosion may occur (Section A(6)).  The SWPPP

27   must include an assessment of potential pollutant sources at the Facility and a description of the

28   BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water

COMPLAINT

discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Section A(9),(10)).

14.     Section C(3) of the General Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.  The report must be submitted to the Regional Board no later than 60 days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Section C(4)(a).

15.     Section C(11)(d) of the General Permit's Standard Provisions requires dischargers to report any noncompliance to the Regional Board.  *See also* Section E(6). Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

16.     The General Permit requires dischargers commencing industrial activities before October 1, 1992, to develop and implement an adequate written monitoring and reporting program no later than October 1, 1992.  Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

17.     As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.

All storm water discharge locations shall be sampled."  Section B(5)(c)(i) requires dischargers to sample and analyze during the wet season for basic parameters, such as pH, total suspended solids, electrical conductance, and total organic content or oil & grease, as well as certain industry-specific parameters.  Section B(5)(c)(ii) requires dischargers to sample for toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Section B(5)(c)(iii) requires discharges to sample for parameters dependent on a facility's standard industrial classification ("SIC") code.  Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.  Section B(7)(a) indicates that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."  Section B(7)(c) requires that "if visual observation and sample collection locations are difficult to observe or sample…facility operators shall identify and collect samples from other locations that represent the quality and quantity of the facility's storm water discharges from the storm event."

18.     Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board.  The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit.  *See also* Sections C(9), C(10) and B(14).

19.     The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any dilution credits to be applied by dischargers.

20.     The Regional Board has established water quality standards for Champlin Creek, Sonoma Creek, and San Pablo Bay in the Water Quality Control Plan for the San Francisco Bay Basin, generally referred to as the Basin Plan.

21.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal or that produce other detrimental responses in aquatic organisms."

22.     The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use."

COMPLAINT

23.     The Basin Plan provides that "[t]he suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses."

24.     The Basin Plan provides that "[w]aters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

25.     The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses."

26.     The Basin Plan provides that "[w]aters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."

27.     The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or otherwise adversely affect beneficial uses."

28.     The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses."

29.     The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

30.     The Basin Plan provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5."

31.     The Basin Plan indicates that Sonoma Creek and its tributaries are impaired by pathogens and that municipal runoff is one of the sources of pathogens.

32.     The Basin Plan establishes a Total Maximum Daily Load for Sonoma Creek for sediment of 117,400 tons/year of which only 500 metric tons/year is allocated to all industrial storm water discharges within the Sonoma Creek watershed.  In addition, the TMDL's waste load allocation limits Soils Plus and other industrial discharges to releases of sediment to 0.3 percent of the natural background levels.

COMPLAINT

9

33.     The EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. EPA has established Parameter Benchmark Values for the following parameters, among others: pH – 6.0-9.0 units; total suspended solids ("TSS") – 100 mg/L, oil and grease ("O&G") – 15 mg/L, total organic carbon ("TOC") – 110 mg/L, and nitrate plus nitrite as nitrogen ("N+N") – 0.68 mg/L.

34.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation for all violations pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.     <u>STATEMENT OF FACTS</u>

35.     Defendant operates an industrial facility located at 4343 Stage Gulch Road in Sonoma, California. The Facility operates under the name "Soils Plus." On information and belief, CSPA alleges that the Facility is engaged in the manufacturing and selling of aggregate rock, soil, and compost products. The Facility falls within SIC Codes 1429 and 1442. The Facility covers approximately 30 acres, the majority of which is unpaved. On information and belief, Plaintiff alleges that there is at least one large building located on the property. Plaintiff is informed and believes, and thereupon alleges that manufacturing of aggregate rock, soil, and compost is primarily conducted outside of this building.

36.     Defendant channels and collects storm water falling on the Facility through a series of pathways that lead to at least one storm water outfall. The Facility's outfall discharges into channels that flow into Champlin Creek, which in turn flows into Sonoma Creek, which flows into San Pablo Bay.

37.     On information and belief, Plaintiff alleges that the industrial activities at the site include the manufacturing and selling of aggregate rock, soil, and compost products. Plaintiff alleges that Defendant also collects recyclable materials including concrete, porcelain, brick, tile and rock. These activities take place outside and are exposed to rainfall. These areas are exposed to

storm water and storm flows due to the lack of overhead coverage, berms, and other storm water controls.

38.     On information and belief, Plaintiff alleges that trucks, tractors, forklifts, and other machinery are the primary means of moving materials around the Facility.  These vehicles and machinery are operated and stored at the Facility in areas exposed to storm water flows.  Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment leak contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids that are exposed to storm water flows, and that such machinery and equipment track sediment and other contaminants throughout the Facility.  Vehicles enter and exit the Facility directly from and to a public road.  On information and belief, Plaintiff alleges that trucks leaving the Facility track substantial amounts of material onto Stage Gulch Road.  During rain events, material that has been tracked from the Facility onto public roads during dry weather is transported via storm water to storm drain channels.

39.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows easily over the surface of the Facility, collecting suspended sediment, dirt, nitrates and nitrites, oils, grease, and other pollutants as it flows toward the storm water drains.  Storm water and any pollutants contained in that storm water entering the drains flows directly to the Facility's outfall which discharges into channels that flow into Champlin Creek, which in turn flows into Sonoma Creek, which flows into San Pablo Bay.

40.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with these and other exposed sources of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.  The Facility lacks controls to prevent the tracking and flow of pollutants onto the adjacent public road.

41.     Since at least January 18, 2010, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in the

COMPLAINT

11

1   Facility's annual reports submitted to the Regional Board. Defendant certified each of those annual

2   reports pursuant to Sections A and C of the General Permit.

3   42.   On April 15, 2013, the Facility's analyzed storm water contained a pH level of 9.6

4   s.u. outside of the range of 6.5 – 8.5 s.u. established in the Basin Plan. This level of pH is also

5   outside of the EPA benchmark value for pH of 6.0 – 9.0 s.u.. This level of pH is in violation of

6   Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2). This is also

7   evidence of ongoing violations of Effluent Limitation B(3) of the General Permit.

8   43.   Since at least January 18, 2010, the Facility has detected total suspended solids in

9   storm water discharged from the Facility. Levels of this pollutant detected in the Facility's storm

10  water have been in excess of EPA's numeric parameter benchmark value for total suspended solids

11  of 100 mg/L. For example, on March 16, 2012, the level of total suspended solids measured by

12  Defendant at its outfall was 635 mg/L. That level of total suspended solids is over 6 times the

13  benchmark value for total suspended solids established by EPA. The Facility also has measured

14  levels of total suspended solids in storm water discharged from the Facility in excess of EPA's

15  benchmark value of 100 mg/L for total suspended solids in nearly every other storm water sample

16  taken at the Facility for the past five years, including March 28, 2014; March 3, 2014; April 5, 2013;

17  November 29, 2012; April 2, 2010; and January 18, 2010.

18  44.   On information and belief, Plaintiff alleges that Defendant failed to analyze its storm

19  water samples for N+N during the past five years. The Facility is required to analyze storm water

20  samples for analytical parameters listed in Table D of the General Permit. Since the Facility has an

21  SIC Code of 1442, it is required to analyze its storm water samples for N+N. Despite reporting that

22  it analyzed various storm water samples for N+N, it is apparent from laboratory results attached to

23  the Facility's Annual Reports that it did not analyze its storm water samples for N+N, but actually

24  analyzed its storm water samples for TOC and falsely reported that value as N+N.

25  45.   On information and belief, Plaintiff alleges that since at least August 2, 2009,

26  Defendant has failed to implement BAT and BCT at the Facility for its discharges of TSS, pH, and

27  other un-monitored pollutants. Section B(3) of the General Permit requires that Defendant

28  implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no

COMPLAINT

later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

46.     On information and belief, Plaintiff alleges that since at least August 2, 2009, Defendant has failed to implement an adequate Storm Water Pollution Prevention Plan for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not include an adequate assessment of potential pollutant sources, structural pollutant control measures employed by Defendant, a list of actual and potential areas of pollutant contact, or an adequate description of best management practices to be implemented at the Facility to reduce pollutant discharges.  According to information available to CSPA, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by Section A of the General Permit.

47.     Information available to CSPA indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility directly to channels that flow into Champlin Creek, which in turn flows into Sonoma Creek, which flows into San Pablo Bay.

48.     Plaintiff is informed and believes, and thereupon alleges, that, Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with Section A(9) of the General Permit.

49.     Plaintiff is informed and believes that Defendant failed to submit to the Regional Board a true and complete annual report certifying compliance with the General Permit since at least July 8, 2010.  Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit, Defendant must submit an annual report, that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and certifying compliance with the General Permit. Plaintiff is informed and believes, and thereupon alleges, that Defendant has signed incomplete

COMPLAINT

13

1  annual reports that purported to comply with the General Permit when there was significant

2  noncompliance at the Facility.

3       50.    Information available to Plaintiff indicates that Defendant has not fulfilled the

4  requirements set forth in the General Permit for discharges from the Facility due to the continued

5  discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that

6  all of the violations alleged in this Complaint are ongoing and continuing.

7  **VI.**   **CLAIMS FOR RELIEF**

8                      **FIRST CAUSE OF ACTION**
                    **Failure to Implement the Best Available and**
9                **Best Conventional Treatment Technologies**
           **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**
10

11       51.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set

12  forth herein.

13       52.    The General Permit's SWPPP requirements and Effluent Limitation B(3) require

14  dischargers to reduce or prevent pollutants in their storm water discharges through implementation

15  of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant

16  has failed to implement BAT and BCT at the Facility for its discharges of TSS, pH, and other un-

17  monitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

18       53.    Each day since August 2, 2009, that Defendant has failed to develop and implement

19  BAT and BCT in violation of the General Permit is a separate and distinct violation of the General

20  Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

21       54.    Defendant has been in violation of the BAT/BCT requirements every day since August

22  2, 2009.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to

23  develop and fully implement BAT/BCT at the Facility.

24                      **SECOND CAUSE OF ACTION**
                   **Failure to Prepare, Implement, Review, and Update**
25                **an Adequate Storm Water Pollution Prevention Plan**
           **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

26       55.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set

27  forth herein.

28       56.    Section A and Provision E of the General Permit requires dischargers of storm water

COMPLAINT
                                        14

associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

57.     Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's the continued exposure and tracking of waste resulting from the operation or maintenance of vehicles at the site; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values.

58.     Defendant has failed to adequately update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

59.     Each day since August 2, 2009, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

60.     Defendant has been in violation of the SWPPP requirements every day since August 2, 2009.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

**THIRD CAUSE OF ACTION**
**Failure to Develop and Implement an Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

61.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

62.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, inter alia, sampling and analysis of discharges) no later than October 1, 1992.

63.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, their failure to monitor for N+N in all storm water samples taken at the Facility during the past five years.

COMPLAINT

15

64.     Each day since August 2, 2009, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

**FOURTH CAUSE OF ACTION**
**False Certification of Compliance in Annual Report**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

65.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

66.     Defendant has falsely certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least July 8, 2010.

67.     Each day since at least July 8, 2010, that Defendant has falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendant continues to be in violation of the General Permit's certification requirement each day that it maintains its false certification of its compliance with the General Permit.

**VII.    RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the Permit;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the Permit;

d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.   Order Defendant to comply with the Permit's monitoring and reporting

COMPLAINT
16

requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

       f. Order Defendant to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

       g. Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

       h. Order Defendant to pay civil penalties of $37,500 per day per violation for all violations of the Act pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

       i. Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

       j. Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

       k. Award any such other and further relief as this Court may deem appropriate.

Dated: October 1, 2014       Respectfully submitted,

                      LOZEAU DRURY LLP

                      By:    */s/ Douglas J. Chermak*_____
                           Douglas J. Chermak
                           Attorneys for Plaintiff
                           CALIFORNIA SPORTFISHING PROTECTION
                           ALLIANCE

COMPLAINT

# EXHIBIT A



T  510.836.4200      410 12th Street, Suite 250      www.lozeaudrury.com
F  510.836.4205      Oakland, Ca 94607               doug@lozeaudrury.com

VIA CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

July 31, 2014

Marv Soiland, President
Marlene K. Soiland, Agent for Service of Process
Soiland Co., Inc.
7171 Stony Point Road
Cotati, CA 94931

Mark Soiland, President
Randy Swegle, Operations Director
Soils Plus
4343 Stage Gulch Road
Sonoma, CA 94553

**Re:    Notice of Violations and Intent to File Suit Under the Federal Water
        Pollution Control Act**

Dear Messrs. Soiland, Soiland, and Swegle:

   I am writing on behalf of the California Sportfishing Protection Alliance ("CSPA") in
regard to violations of the Federal Water Pollution Control Act (the "Clean Water Act" or "Act")
that CSPA believes are occurring at Soiland Co., Inc.'s industrial facility, operating under the
name of "Soils Plus,", located at 4343 Stage Gulch Road in Sonoma, California ("Facility").
CSPA is a non-profit public benefit corporation dedicated to the preservation, protection, and
defense of the environment, wildlife, and natural resources of the Sonoma Creek, the San Pablo
Bay, and other California waters.  This letter is being sent to you as the responsible owners,
officers, or operators of the Facility (all recipients are hereinafter collectively referred to as
"Soils Plus").

   This letter addresses Soils Plus's unlawful discharge of pollutants from the Facility
through channels that flow into Sonoma Creek.  The Facility is discharging storm water pursuant
to National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State
Water Resources Control Board ("State Board") Water Quality Order No. 92-12-DWQ as

Soiland, Soiland, and Swegle
Soils Plus
July 31, 2014
Page 2 of 10

amended by Order No. 97-03-DWQ (hereinafter "General Permit").[1]  The WDID identification number for the Facility listed on documents submitted to the Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board"), is 2 49I016029.  The Facility is engaged in ongoing violations of the substantive and procedural requirements of the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act.  33 U.S.C. § 1365(a).  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violations and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility.  Consequently, Soils Plus is hereby placed on formal notice by CSPA that, after the expiration of sixty days from the date of this Notice of Violations and Intent to Sue, CSPA intends to file suit in federal court against Soils Plus under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), for violations of the Clean Water Act and the General Permit.  These violations are described more extensively below.

## I.    Background.

On August 15, 2000, the State Board accepted Soils Plus's Notice of Intent to Comply With the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI").  In its NOI, Soils Plus certifies that the Facility is classified under SIC codes 1429 and 1442.  The Facility collects and discharges storm water from its 30-acre industrial site through at least one storm water outfall.  CSPA is informed and believes that all storm water discharged from the site is associated with industrial activity or, alternatively, includes commingled storm water from both industrial and non-industrial activity.   The Facility's outfall discharges into channels that flow into Champlin Creek.  Champlin Creek in turn flows into Sonoma Creek, which flows into San Pablo Bay.

The Regional Board has identified beneficial uses of the region's waters and established water quality standards for Champlin Creek, Sonoma Creek, and San Pablo Bay in the "Water Quality Control Plan for the San Francisco Bay Basin," generally referred to as the "Basin Plan." *See* http://www.waterboards.ca.gov/sanfranciscobay/basin_planning.shtml.
The beneficial uses of these waters include among others contact and non-contact water recreation, commercial and sport fishing, cold freshwater habitat, fish migration, preservation of rare and endangered species, fish spawning, warm freshwater habitat, and wildlife habitat.  The

---

[1] On April 1, 2014, the State Board reissued the General Permit, continuing its mandate that industrial facilities implement the best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT") and, in addition, establishing numeric action levels mandating additional pollution control efforts.  State Board Order 2014-0057-DWQ.  The new permit, however, does not go into effect until July 1, 2015.  Until that time, the current General Permit remains in full force and effect.

Soiland, Soiland, and Swegle
Soils Plus
July 31, 2014
Page 3 of 10

non-contact recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tide pool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities.  Water quality considerations relevant to non-contact water recreation, such as hiking, camping, or boating, and those activities related to tide pool or other nature studies require protection of habitats and aesthetic features." *Id.* at 2.1.16.  Visible pollution, including visible sheens and cloudy or muddy water from industrial areas, impairs people's use of Champlin Creek and Sonoma Creek for contact and non-contact water recreation.

The Basin Plan establishes water quality standards for Champlin Creek, Sonoma Creek, and San Pablo Bay.  The Basin Plan provides that the "pH shall not be depressed below 6.5 nor raised above 8.5." *Id*. at 3.3.9.  The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are lethal or that produce other detrimental responses in aquatic organisms." *Id*. at 3.3.18.  The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use." *Id*. at 3.3.21.  The Basin Plan provides that "[w]aters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses." *Id*. at 3.3.14.  The Basin Plan provides that "[t]he suspended sediment load and suspended sediment discharge rate of surface waters shall not be altered in such a manner as to cause nuisance or adversely affect beneficial uses." *Id.* at 3.3.12.  The Basin Plan provides that "[w]aters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses." *Id*. at 3.3.19.  The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses." *Id.* at 3.3.4.  The Basin Plan provides that "[w]aters shall not contain floating material, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses." *Id*. at 3.3.6.  The Basin Plan provides that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses." *Id*. at 3.3.7.

The Basin Plan indicates that Sonoma Creek and its tributaries are impaired by pathogens.  *Id.* at 7.8.  The Basin Plan indicates that municipal runoff is one of the sources of pathogens.  *Id.* at 7.8.2.2.  The Basin Plan also establishes a Total Maximum Daily Load for Sonoma Creek for sediment of 117,400 tons/year of which only 500 metric tons/year is allocated to all industrial storm water discharges within the Sonoma Creek watershed.  *Id.* at Table 7.8.3-2; Table 7.8.4-3b.   In addition, the TMDL's waste load allocation limits Soils Plus and other industrial discharges to releases of sediment to 0.3 percent of the natural background levels.  *Id*.,

The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology

Soiland, Soiland, and Swegle
Soils Plus
July 31, 2014
Page 4 of 10

economically achievable ("BAT") and best conventional pollutant control technology ("BCT").[2] The following benchmarks have been established for pollutants discharged by Soils Plus: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; total organic carbon – 110 mg/L; and nitrate plus nitrite as nitrogen ("N+N") – 0.68 mg/L.

## II.     Alleged Violations of the Clean Water Act and the General Permit.

### A.     *Discharges in Violation of the Permit not Subject to BAT/BCT*

Soils Plus has violated and continues to violate the terms and conditions of the General Permit.  Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit such as the General Permit.  33 U.S.C. § 1342.  The General Permit prohibits any discharges of storm water associated with industrial activities or authorized non-storm water discharges that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand ("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

In addition, Discharge Prohibition A(1) of the General Permit prohibits the discharge of materials other than storm water (defined as non-storm water discharges) that discharge either directly or indirectly to waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.  The General Permit does not authorize the application of any mixing zones for complying with Receiving Water Limitation C(2).  As a result, compliance with this provision is measured at the Facility's discharge monitoring locations.

Soils Plus has violated and continues to violate the terms and conditions of the General Permit.  In particular, Soils Plus has discharged and continues to discharge storm water with

---

[2] The Benchmark Values can be found at:
http://www.epa.gov/npdes/pubs/msgp2008_finalpermit.pdf and
http://cwea.org/p3s/documents/multi-sectorrev.pdf (Last accessed on July 30, 2014).

Soiland, Soiland, and Swegle
Soils Plus
July 31, 2014
Page 5 of 10

unacceptable levels of pH, TSS, and other pollutants in violation of the General Permit. Soils Plus's sampling and analysis results reported to the Regional Board confirm discharges of specific pollutants and materials other than storm water in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1492 (9th Cir. 1988).

On April 5, 2013, the Facility's analyzed storm water contained a pH level of 9.6 s.u. in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2). This is also evidence of ongoing violations of Effluent Limitation B(3) of the General Permit.

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) and are evidence of ongoing violations of Effluent Limitation B(3) of the General Permit.

| Date | Parameter | Observed Concentration | EPA Benchmark Value | Outfall (as identified by the Facility) |
|------|-----------|------------------------|---------------------|------------------------------------------|
| 3/28/2014 | Total Suspended Solids | 150 mg/L | 100 mg/L | Pond Outlet |
| 3/3/2014 | Total Suspended Solids | 345 mg/L | 100 mg/L | Pond Outlet |
| 4/5/2013 | Total Suspended Solids | 229 mg/L | 100 mg/L | Pond Outlet |
| 4/5/2013 | pH | 9.6 s.u. | 6.0 – 9.0 s.u. | Pond Outlet |
| 11/29/2012 | Total Suspended Solids | 485 mg/L | 100 mg/L | Pond Outlet |
| 3/16/2012 | Total Suspended Solids | 635 mg/L | 100 mg/L | Pond Outlet |
| 4/2/2010 | Total Suspended Solids | 247 mg/L | 100 mg/L | Pond Outlet |
| 1/18/2010 | Total Suspended Solids | 340 mg/L | 100 mg/L | Pond Outlet |

The information in the above table reflects data gathered from Soils Plus's self-monitoring during the 2009-2010, 2010-2011, 2011-2012, 2012-2013, and 2013-2014 wet seasons. CSPA alleges that during each of those wet seasons and continuing through today, Soils Plus has discharged storm water contaminated with pollutants at levels that exceed one or more applicable EPA Benchmarks, including but not limited to each of the following:

   o  Total Suspended Solids – 100 mg/L
   o  pH – 6.0 – 9.0 s.u.

CSPA's investigation, including its review of Soils Plus's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's benchmark values, as well as the applicable water quality standard for pH, indicates that Soils Plus has not implemented BAT and BCT at the Facility for its discharges of TSS, pH, and other pollutants in violation of Effluent Limitation B(3) of the General Permit. Soils Plus was required to have implemented BAT and BCT by no later than October 1, 1992, or the date the Facility began

Soiland, Soiland, and Swegle
Soils Plus
July 31, 2014
Page 6 of 10

operating.  Thus, Soils Plus is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

In addition, the numbers listed above indicate that the Facility is discharging polluted storm water in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.  CSPA alleges that such violations also have occurred and will occur on other rain dates, including every significant rain event that has occurred since July 31, 2009, and that will occur at the Facility subsequent to the date of this Notice of Violations and Intent to File Suit.  Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Soils Plus has discharged storm water containing impermissible levels of TSS and pH in violation of Effluent Limitation B(3), Discharge Prohibitions A(1) and A(2), and Receiving Water Limitations C(1) and C(2) of the General Permit.[3]

These unlawful discharges from the Facility are ongoing.  Each discharge of storm water containing any of these pollutants constitutes a separate violation of the General Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Soils Plus is subject to penalties for violations of the General Permit and the Act since July 31, 2009.

### B.    Failure to Develop and Implement an Adequate Monitoring and Reporting Program

Section B of the General Permit describes the monitoring requirements for storm water and non-storm water discharges.  Facilities are required to make monthly visual observations of storm water discharges (Section B(4)) and quarterly visual observations of both unauthorized and authorized non-storm water discharges (Section B(3)).  Section B(5) requires facility operators to sample and analyze at least two storm water discharges from all storm water discharge locations during each wet season.  Section B(7) requires that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event."

The above referenced data was obtained from the Facility's monitoring program as reported in its Annual Reports submitted to the Regional Board.  This data is evidence that the Facility has violated various Discharge Prohibitions, Receiving Water Limitations, and Effluent Limitations in the General Permit.  To the extent the storm water data collected by Soils Plus is not representative of the quality of the Facility's various storm water discharges and that the Facility failed to monitor all qualifying storm water discharges, CSPA alleges that the Facility's monitoring program violates Sections B(3), (4), (5) and (7) of the General Permit.

---

[3] The rain dates are all the days when 0.1" or more rain fell as measured by a weather station in Sonoma approximately 3.7 miles from the facility.  The weather data can be obtained at http://www.ipm.ucdavis.edu/calludt.cgi/WXDESCRIPTION?STN=SONOMA.C (Last accessed on July 31, 2014).

Soiland, Soiland, and Swegle
Soils Plus
July 31, 2014
Page 7 of 10

In addition, the Facility is required to analyze storm water samples for analytical parameters listed in Table D of the General Permit. Since the Facility has an SIC Code of 1442, it is required to analyze its storm water samples for N+N. During the past five years, the Facility has failed to analyze its storm water samples for N+N. Despite reporting that it analyzed various storm water samples for N+N, it is apparent from laboratory results attached to the Facility's Annual Reports that it did not analyze its storm water samples for N+N, but actually analyzed its storm water samples for TOC and falsely reported that value as N+N. This results in at least ten violations of the General Permit.

The above violations are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Soils Plus is subject to penalties for violations of the General Permit and the Act's monitoring and sampling requirements since July 31, 2009.

### C.   Failure to Prepare, Implement, Review and Update an Adequate Storm Water Pollution Prevention Plan

Section A and Provision E(2) of the General Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992. Section A(1) and Provision E(2) require dischargers who submitted an NOI pursuant to the General Permit to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)). The SWPPP must include BMPs that achieve BAT and BCT (Effluent Limitation B(3)). The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials handled and stored at the site (Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including

Soiland, Soiland, and Swegle
Soils Plus
July 31, 2014
Page 8 of 10

structural BMPs where non-structural BMPs are not effective (Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Section A(9),(10)).

CSPA's investigation of the conditions at the Facility as well as Soils Plus's Annual Reports indicate that Soils Plus has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above.  Soils Plus has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary.  Soils Plus has been in continuous violation of Section A and Provision E(2) of the General Permit every day since July 31, 2009, at the very latest, and will continue to be in violation every day that Soils Plus fails to prepare, implement, review, and update an effective SWPPP.  Soils Plus is subject to penalties for violations of the General Permit and the Act occurring since July 31, 2009.

### D.      Failure to File True and Correct Annual Reports

Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board.  The Annual Report must be signed and certified by an appropriate corporate officer.  General Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their Annual Report an evaluation of their storm water controls, including certifying compliance with the General Permit.  *See also* General Permit, Sections C(9) and (10) and B(14).

For the last four wet seasons, Soils Plus and its agents, Randy Swegle and Debbie Ternes, inaccurately certified in its Annual Reports that the Facility was in compliance with the General Permit.  Consequently, Soils Plus has violated Sections A(9)(d), B(14), and C(9) & (10) of the General Permit every time Soils Plus failed to submit a complete or correct report and every time Soils Plus or its agents falsely purported to comply with the Act.  Soils Plus is subject to penalties for violations of Section (C) of the General Permit and the Act occurring since at least July 8, 2010.

## III.    Persons Responsible for the Violations.

CSPA puts Soils Plus, Marv Soiland, and Mark Soiland on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts Soils Plus on notice that it intends to include those persons in this action.

Soiland, Soiland, and Swegle
Soils Plus
July 31, 2014
Page 9 of 10

**IV.      Name and Address of Noticing Parties.**

The name, address, and telephone number of CSPA is as follows:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainier Avenue
Stockton, CA 95204
Tel. (209) 464-5067
Fax (209) 464-1028
E-Mail: deltakeep@me.com

**V.      Counsel.**

CSPA has retained our office to represent it in this matter.  Please direct all communications to:

Michael R. Lozeau
Douglas J. Chermak
Lozeau Drury LLP
410 12th Street, Suite 250
Oakland, California 94607
Tel. (510) 836-4200
Fax (510) 836-4205
michael@lozeaudrury.com
doug@lozeaudrury.com

**VI.      Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Soils Plus to a penalty of up to $37,500 per day per violation.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)) permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  CSPA intends to file a citizen suit under Section 505(a) of the Act against Soils Plus for the above-referenced violations upon the expiration of the 60-day notice period. However, during the 60-day notice period, CSPA would be willing to discuss effective remedies for the violations noted in this letter.  If you wish to pursue such discussions in the absence of litigation, CSPA suggests that you initiate those discussions within the next 20 days so that they

Notice of Violations and Intent to File Suit

Soiland, Soiland, and Swegle
Soils Plus
July 31, 2014
Page 10 of 10

may be completed before the end of the 60-day notice period.  CSPA does not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Douglas J. Chermak
Lozeau Drury LLP
Attorneys for California Sportfishing Protection Alliance

## <u>SERVICE LIST – via certified mail</u>

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, D.C. 20460

Thomas Howard, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Eric Holder, U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Jared Blumenfeld, Regional Administrator
U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Bruce H. Wolfe, Executive Officer II
San Francisco Bay Regional Water Quality Control Board
1515 Clay Street, Suite 1400
Oakland, CA 94612

**ATTACHMENT A**
Rain Dates, Soils Plus, Sonoma, California

| | | |
|---|---|---|
| 9/14/2009 | 3/3/2010 | 12/22/2010 |
| 10/13/2009 | 3/4/2010 | 12/25/2010 |
| 10/19/2009 | 3/10/2010 | 12/26/2010 |
| 10/20/2009 | 3/12/2010 | 12/28/2010 |
| 11/6/2009 | 3/31/2010 | 12/29/2010 |
| 11/20/2009 | 4/2/2010 | 12/31/2010 |
| 12/11/2009 | 4/4/2010 | 1/1/2011 |
| 12/12/2009 | 4/5/2010 | 1/2/2011 |
| 12/13/2009 | 4/12/2010 | 1/13/2011 |
| 12/16/2009 | 4/20/2010 | 1/29/2011 |
| 12/21/2009 | 4/27/2010 | 1/30/2011 |
| 12/25/2009 | 5/9/2010 | 2/14/2011 |
| 12/27/2009 | 5/10/2010 | 2/15/2011 |
| 12/30/2009 | 5/17/2010 | 2/16/2011 |
| 1/2/2010 | 5/25/2010 | 2/17/2011 |
| 1/12/2010 | 5/26/2010 | 2/18/2011 |
| 1/13/2010 | 5/28/2010 | 2/19/2011 |
| 1/14/2010 | 10/22/2010 | 2/24/2011 |
| 1/17/2010 | 10/23/2010 | 2/25/2011 |
| 1/18/2010 | 10/24/2010 | 3/2/2011 |
| 1/19/2010 | 10/29/2010 | 3/5/2011 |
| 1/20/2010 | 11/7/2010 | 3/6/2011 |
| 1/21/2010 | 11/10/2010 | 3/13/2011 |
| 1/22/2010 | 11/20/2010 | 3/15/2011 |
| 1/23/2010 | 11/21/2010 | 3/17/2011 |
| 1/24/2010 | 11/23/2010 | 3/18/2011 |
| 1/25/2010 | 11/27/2010 | 3/19/2011 |
| 1/26/2010 | 12/3/2010 | 3/20/2011 |
| 1/30/2010 | 12/5/2010 | 3/22/2011 |
| 2/4/2010 | 12/6/2010 | 3/23/2011 |
| 2/5/2010 | 12/8/2010 | 3/24/2011 |
| 2/6/2010 | 12/9/2010 | 3/25/2011 |
| 2/9/2010 | 12/14/2010 | 3/26/2011 |
| 2/23/2010 | 12/17/2010 | 4/7/2011 |
| 2/24/2010 | 12/18/2010 | 4/25/2011 |
| 2/26/2010 | 12/19/2010 | 5/14/2011 |
| 2/27/2010 | 12/20/2010 | 5/16/2011 |
| 3/2/2010 | 12/21/2010 | 5/17/2011 |

Notice of Violations and Intent to File Suit

| | | |
|---|---|---|
| 5/25/2011 | 10/31/2012 | 2/1/2014 |
| 5/28/2011 | 11/1/2012 | 2/2/2014 |
| 5/31/2011 | 11/16/2012 | 2/3/2014 |
| 6/1/2011 | 11/17/2012 | 2/5/2014 |
| 6/4/2011 | 11/18/2012 | 2/6/2014 |
| 6/5/2011 | 11/24/2012 | 2/7/2014 |
| 6/28/2011 | 11/28/2012 | 2/8/2014 |
| 10/4/2011 | 11/29/2012 | 2/9/2014 |
| 10/5/2011 | 11/30/2012 | 2/26/2014 |
| 11/5/2011 | 12/1/2012 | 2/28/2014 |
| 11/8/2011 | 12/2/2012 | 3/3/2014 |
| 11/9/2011 | 12/4/2012 | 3/5/2014 |
| 11/10/2011 | 12/5/2012 | 4/4/2014 |
| 11/11/2011 | 12/15/2012 | 4/25/2014 |
| 11/12/2011 | 12/16/2012 | |
| 11/13/2011 | 12/17/2012 | |
| 11/19/2011 | 12/21/2012 | |
| 11/20/2011 | 12/22/2012 | |
| 11/24/2011 | 12/23/2012 | |
| 1/19/2012 | 12/25/2012 | |
| 1/20/2012 | 1/5/2013 | |
| 1/22/2012 | 1/23/2013 | |
| 1/23/2012 | 2/7/2013 | |
| 2/7/2012 | 2/19/2013 | |
| 2/12/2012 | 3/6/2013 | |
| 2/14/2012 | 3/20/2013 | |
| 2/29/2012 | 3/31/2013 | |
| 3/13/2012 | 4/1/2013 | |
| 3/14/2012 | 4/4/2013 | |
| 3/16/2012 | 4/7/2013 | |
| 3/24/2012 | 11/19/2013 | |
| 3/25/2012 | 11/20/2013 | |
| 3/27/2012 | 12/6/2013 | |
| 3/31/2012 | 1/17/2014 | |
| 4/10/2012 | 1/18/2014 | |
| 4/11/2012 | 1/21/2014 | |
| 4/12/2012 | 1/23/2014 | |
| 7/31/2012 | 1/28/2014 | |
| 10/21/2012 | 1/29/2014 | |
| 10/22/2012 | 1/30/2014 | |
| 10/25/2012 | 1/31/2014 | |

Notice of Violations and Intent to File Suit